UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
08-CV-6062 (JMR/AJB)

The Kinetic Co., on behalf      )
of itself and all others        )
similarly situated              )
                                )      ORDER
        v.                      )
                                )
Medtronic, Inc.                 )

        Plaintiff is a self-insured employer which pays its employees'

medical expenses.  It seeks to represent a putative class of third-

party payors (or "TPPs") for medical services.  Plaintiff also

seeks reimbursement for medical expenses resulting from the recall

of certain cardiac devices manufactured by defendant.

        This matter is before the Court on defendant's motion to

dismiss the complaint.  The motion is denied.

I.  <u>Background</u>[1]

        Defendant, Medtronic, Inc. ("Medtronic"), manufactures medical

devices, including implantable cardiac care devices.  In January,

2003, Medtronic discovered evidence of possible battery defects in

its implantable cardiac defibrillators.  These batteries were

expected to have a service life of several years, but Medtronic

discovered they might discharge in as little as days or months.

Medtronic continued to market the devices without disclosing this

_____

        [1] The facts are drawn from plaintiff's complaint, memorandum,
and supporting materials.  When considering a motion to dismiss
under Fed. R. Civ. P. 12(b)(6), the Court assumes all facts alleged
in the complaint to be true, and draws all reasonable inferences in
plaintiff's favor.  <u>Drobnak v. Andersen Corp.</u>, 561 F.3d 778, 781
(8th Cir. 2009).  The same test applies to a motion to dismiss for
lack of standing.  <u>Warth v. Seldin</u>, 422 U.S. 490, 501 (1975).

defect, resulting in patients continuing to receive these surgically-implanted devices.

When Medtronic acknowledged, and the Food and Drug Administration ("FDA") recognized, the risk of this potentially catastrophic premature battery failure, Medtronic recalled certain models of implantable defibrillators in April, 2004.[2] In February, 2005, the recall was expanded to include four additional models.

Plaintiff, Kinetic Co. ("Kinetic"), provides health benefits directly to its employees. The costs associated with the implantation, subsequent explantation, and reimplantation of at least one such cardiac defibrillator were borne by Kinetic.[3] After the recall, a Kinetic employee's defibrillator was removed and replaced, requiring plaintiff to pay for the second surgery.[4] Medtronic provided the employee with a free replacement

---

[2] The facts surrounding the defibrillator recall – and the multidistrict litigation ("MDL") that followed – are more fully delineated in this Court's Order in In re Medtronic, Inc., Implantable Defibrillators Litig., 465 F. Supp. 2d 886, 888-92 (D. Minn. 2006).

[3] Kinetic alleges it "has been party to a contract, issuer of a policy or sponsor of a plan, which contract, policy or plan provides medical coverage to natural persons. During the class period, Kinetic has been billed for and paid charges for Medtronic products and costs associated with their replacement at issue in this litigation" as described elsewhere in the complaint. (Compl. ¶ 4.)

[4] Kinetic alleges it has "incurred full or partial costs for the Recalled Cardiac Devices and related medical costs including, but not limited to, the original defective device, implantation surgery, replacement surgery, medical monitoring and/or other related healthcare costs." (Compl. ¶ 37.)

device, but it did not reimburse plaintiff for the cost of the defective device or the second surgery.

In the face of this medical device recall, and the consequent removal and replacement of potentially-defective battery-bearing devices, a significant number of patients sued Medtronic for physical and emotional injuries associated with the defective defibrillators. These lawsuits were consolidated into a multidistrict litigation ("MDL") case subsequently assigned to this Court. Plaintiff's initial complaint against Medtronic was consolidated into the MDL; by agreement of the parties, it was later dismissed without prejudice.

Plaintiff refiled its complaint in Anoka County, Minnesota, on its own behalf, and on behalf of a putative class of third-party payors. Plaintiff's refiled complaint claims Medtronic's defective defibrillators caused health insurers "to incur substantially greater costs than they should and otherwise would have paid for medical treatment." (Compl. ¶3.) Medtronic timely removed the case to federal court, and now moves to dismiss. Plaintiff opposes dismissal.

II. <u>Analysis</u>

Plaintiff has advanced a number of legal theories in support of its claim for reimbursement. At the same time, it has abandoned its claims of negligence, negligence per se, strict liability failure to warn, and strict liability design defect, all of which

are dismissed with prejudice.[5]

Plaintiff now alleges violations of the Minnesota False Statements in Advertising Act, Minn. Stat. § 325F.67; the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44; the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69; and various unfair and deceptive trade practices statutes of other states. Plaintiff also claims defendant is liable on theories of subrogation, unjust enrichment, breach of express and implied warranties, breach of assumed contractual warranties, and misrepresentation by omission.

Defendant denies any liability. First, it denies plaintiff has standing to assert any claim for damages. Second, it denies the validity of each of plaintiff's remaining theories.

A.  <u>Standing</u>[6]

To possess standing, a plaintiff must establish (1) an "injury in fact," (2) "fairly traceable to the challenged action of the defendant," such that (3) the injury will be "redressed by a favorable decision." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992) (internal quotations omitted). A legal "injury in fact" is "an invasion of a legally protected interest which is (a)

---

[5] The United States Supreme Court found such claims preempted by the Medical Device Amendments to the federal Food, Drug and Cosmetic Act. <u>See</u> <u>Riegel v. Medtronic, Inc.</u>, 552 U.S. 312, ___, 128 S.Ct. 999, 1011 (2008).

[6] In the Medtronic MDL, the Court denied, without comment, defendant's motion to dismiss the Master Complaint concerning third-party payors. <u>See</u> [Docket No. 23] Exhibit B at 4-5.

4

concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." <u>Id.</u> at 560 (internal quotations omitted). Ultimately, plaintiff must, itself, be among the injured. <u>Id.</u> at 563.

The Court acknowledges its colleague's decision in the <u>Guidant</u> MDL, finding third-party payors, such as plaintiff here, without standing to seek reimbursement of medical expenses. <u>See</u> <u>In Re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.</u>, 484 F. Supp. 2d 973, 983 (D. Minn. 2007) (Frank, J.) ("<u>Guidant</u>"). Defendant, understandably, suggests this Court be guided by that ruling. The Court, with great respect to its colleague, declines to adopt the <u>Guidant</u> rationale or Medtronic's view.

This Court opts against <u>Guidant</u>'s holding, because this Nation's present health care regime almost always requires third-party payors to shoulder a significant portion of the employees' costs of medical services. To deny this fact, and to extract legal conclusions from the denial, denies reality, and real financial injuries occurring in the real world. In this case - the Court crediting, as it must, plaintiff's allegations - Kinetic paid for the original installation of its employee's medically-required defibrillator. It did so under its employer-supplied health payment plan. But when it did, it ostensibly paid for a properly-functioning defibrillator, with an expected life-cycle. It got, instead, a defibrillator with a potentially early-discharging battery, which might subject its employee to a catastrophic risk.

5

The remedy, according to defendant as well as the FDA, was early explantation and replacement, far earlier than the device's normally expected service life. This Court considers that Kinetic, and those it seeks to represent, understood they might be called upon to regularly bear the expense of normal battery replacement. Such a cost should be built into the cost of health insurance plaintiff and the putative class members undertook when they either self-insured or secured insurance for their employees. But what occurred here is an extra, early, additional cost caused by the device's premature risk of battery failure. Medtronic caused this cost, and by this motion, it seeks to shift the cost to plaintiff and its putative class.

Explantation and replacement are surgical procedures executed at considerable expense. When this procedure is multiplied by defendant's actions and inactions, this extraordinary cost establishes the damages allegedly incurred by third-party payors, such as plaintiff. This is actual injury; there is nothing remote, speculative, or hypothetical about it.

This Court found, in <u>In re Medtronic, Inc., Implantable Defibrillators Litig.</u>, 465 F. Supp. 2d 886, 888-92 (D. Minn. 2006), that defendant had evidence of potentially catastrophic battery failure in its implantable defibrillators as early as January, 2003. It tested the battery between February and September of 2003, and began developing a replacement in the spring of 2003. But for six months, it entirely failed to advise the FDA of its

findings, or of the reason why it was developing a replacement battery. During all this time, knowing of a risk of premature battery failure, Medtronic continued to ship its implantable defibrillators containing the known-to-be potentially dangerous batteries. Medtronic, knowing this risk could be ameliorated only by early explantation and replacement, also knew it was subjecting whoever paid for the necessary procedures to a double or extra cost - a cost caused by its own defective batteries.

Indulge the Court in a flawed thought experiment: Assume a wealthy person, fully able to pay for all medical procedures without insurance. Assume this person needed, and purchased - directly from Medtronic - the defective implantable defibrillator at issue here. There is no question this person would sustain actual injury and possess standing to sue Medtronic for the cost of explantation of an implanted defibrillator containing the potentially-defective battery and reinstallation of a properly outfitted one.

But the Court recognizes the flaw in its thought experiment. The thought experiment is flawed because there is, virtually, no such person in the United States today. Since the middle of the last century, this Nation has adopted a health care regime under which employers provide, either from their own funds, or through insurance, for their employees' medical needs. Employers, or their insurers, bear the costs of the employee's medical fees and charges. And, as Medtronic had every reason to know, these

employers or their insurers are the parties bearing the actual economic injury.

In the face of this reality, it is neither fair nor just to hold that the Court's hypothetical, almost non-existent, wealthy person has standing to sue for medical costs paid personally and "directly," but that third-party payors, which have paid for the same procedure on behalf of their insureds, lack that same standing.

Medtronic may argue that it never sold its defibrillators to plaintiff or members of the putative class. It then may extend this argument to suggest there is no legal relationship between itself and the putative plaintiff class which can result in any legal liability. The argument is false, and falls of its own weight. The Court cannot doubt that the third-party payors never went to market and purchased Medtronic's battery-equipped cardiac care devices; Medtronic almost certainly sold them to the physicians or hospitals which installed them. And it is most unlikely the third-party payors selected which particular device was to be implanted in any individual patient.

But when Medtronic blithely asserts that the third-party payors - which ultimately reimbursed the physicians or hospitals which held the device in inventory - are barred from any recovery, it is wrong. It is wrong, because this cost is simply the last falling domino in a long line started by Medtronic. And when it falls, it injures the third-party payors. Medtronic cannot be

protected against its own harm by marketing its products through intermediaries. Each intermediate player has been made whole. It ill-befits Medtronic - and the law will not allow it - to attempt to shield itself from its ultimate and true financial victim.

Medtronic engages in a sophistry when it argues there is no relationship between itself and plaintiff. Without third-party payors, there would be no Medtronic, or any implantable defibrillators at all in the United States. Money from employers and insurers flows to Medtronic, creating the market for these devices and funding the medical research which develops them. When Medtronic provided a potentially dangerous device knowing it would put the patient at risk, it also knew where the replacement cost would fall - on third-party payors.

For this reason, the Court opts against the Guidant rationale. The Court, instead, finds Kinetic's economic injuries are analogous to those suffered by plaintiffs in Desiano v. Warner-Lambert Co., 326 F.3d 339, 349 (2d Cir. 2003). Where the Guidant Court distinguished Desiano, this Court embraces it.

In Desiano, insurers commenced a consumer fraud action to recover costs associated with the drug Rezulin, claiming the drug manufacturers misrepresented its safety. The insurers alleged "they would not have bought Defendants' product, rather than available cheaper alternatives, had they not been misled by Defendants' misrepresentations." Desiano, 326 F.3d at 349. The

Second Circuit found the insurers' economic losses were a sufficient injury-in-fact, noting they were "in no way derivative of damage to a third party," because they were "unaffected by whether any given patient who ingested Rezulin became ill."  Id. (internal quotations omitted.)

Kinetic's claim is similarly unaffected by whether its employee suffered physical or emotional injury associated with using Medtronic's product.  What matters is that Kinetic was required to pay prematurely for replacement surgery.  If Medtronic had timely disclosed the problems associated with the first device, Kinetic - like the insurers in Desiano - might have taken steps to avoid paying for it in the first place.  See Desiano, 326 F.3d at 349 n.9; see also In re Zyprexa Prods. Liab. Litig., 493 F. Supp. 2d 571, 577 (E.D.N.Y. 2007).

Even in the antitrust context, where a "direct purchaser" is required as a matter of substantive law, courts have found health insurers' overpricing claims are not too remote to confer standing. See Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 65 F.3d 1406, 1414 (7th Cir. 1995) (payment from TPP directly to clinic); In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 543 (D.N.J. 2004) (TPPs' allegation they reimbursed members for cost of defendant's products has "pled sufficiently a direct injury to survive a motion to dismiss.")  The Court finds plaintiff has alleged an injury in fact.

Plaintiff has also properly alleged causation.  Defendants'

argument that causation "depends on the unfettered choices made by independent actors not before the courts," see Lujan, 504 U.S. at 562, is not in itself fatal to standing.  Rather, in such cases, plaintiff must allege "facts showing that those choices have been . . . made in such manner as to produce causation and permit redressability of injury."  Id.

Here, as in Desiano, independent medical professionals play a role in the causal chain.  There, insurers were contractually bound to pay for Rezulin which doctors had prescribed, and pharmacies had supplied, to their insureds.  See Desiano, 326 F.3d at 350.  There, as here, doctors are "independent actors" making "unfettered choices" about medical treatment.  Yet the Second Circuit found causation and redressability, and this Court has no difficulty reaching the same conclusion.

Medtronic asks the Court to consider the case of Rivera v. Wyeth-Ayerst Laboratories, 283 F.3d 315 (5th Cir. 2002).  The Court has done so, and finds Rivera distinguishable.  That case involved Duract, a safe and effective pain reliever in short term use, but which could cause liver failure over the long term.  Plaintiff Rivera was a short-term Duract user who suffered no ill effects. Nonetheless, when Duract was withdrawn from the market, Rivera and her insurer sought reimbursement of the money both had spent purchasing the drug.  Rivera, 283 F.3d at 317.

The Fifth Circuit, understandably, found neither patient nor insurer had standing to sue.  Because the drug was safe and

effective for short term use, there was nothing to improve, and no need for a warning to Rivera or her doctor. A manufacturer's warning about injuries associated with long-term use would not be directed to a doctor prescribing the product for short-term use. On those facts, the Fifth Circuit found plaintiff failed to allege actual injury and causation. Id. at 320-21.

Rivera is not analogous to this case. Here, Kinetic assumed a contractual duty to pay for its employees' medically necessary care. An employee's doctor advised implantation of a particular Medtronic device. When Medtronic sold the device, however, it knew - but did not disclose - the device bore a potentially defective battery. Medtronic did not disclose this information to the FDA, the physician, or the ultimate recipient.

The device was purchased by, and surgically implanted at, a hospital. Kinetic reimbursed the hospital for the cost of the device and the surgery. Medtronic then recalled the device. In stark contrast to Rivera, Kinetic's employee was exposed to real risks of which his doctor was unaware - risks which, if known, might have influenced the hospital, the doctor, or the patient to opt for a different product, or might have prompted Kinetic to decline to pay for the procedure. Not even defendant implies a doctor would knowingly select and implant a defective defibrillator.

The alleged causative chain is not complicated. Kinetic alleges Medtronic sold devices for surgical implantation into

12

patients knowing a significant number of those devices exhibited defects posing a risk to patients' lives. Notwithstanding this knowledge, Medtronic neither disclosed this information, nor ceased selling the potentially-defective product, thus continuing to expose more patients to the risk of which it was aware. Medtronic's failure to advise the FDA or the physicians who prescribed the device led doctors to continue to select, and insurers to continue to pay for, potentially defective devices without knowing of the potentially-catastrophic risk. Had Medtronic timely disclosed the risks it knew its product presented, insurers might have refused to pay for the original device or the costs to implant it.

The intervening choices of the employee's medical providers, while arguably independent exercises of "broad and legitimate discretion," Lujan, represented decisions the doctors and hospitals made because of Medronic's failure to disclose the known risk. Once informed, they were constrained to replace the product to avoid the risk Medtronic caused and multiplied. Plaintiff has alleged both injury and causation. Kinetic has standing to bring this action.

B. Ripeness

Defendant claims this action is premature, arguing Kinetic's claims are not ripe. The ripeness doctrine is designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Neb. Pub. Power

13

Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1037 (8th Cir. 2000) (internal quotation omitted). Before a federal court may address a question, there must be a "real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." Id. at 1037-38 (internal quotations omitted).

The Guidant court found the third-party payor's claims were not ripe because there had been no prior adjudication of defendant's liability to patients who received defective devices. See Guidant, 484 F. Supp. 2d at 984 n. 6. Medtronic urges the same conclusion here, because Kinetic's employee never brought suit against it. The argument compounds Medtronic's sophistry.

This matter is absolutely ripe for adjudication. As already observed, there is nothing abstract or hypothetical about this dispute. All events giving rise to Kinetic's causes of action have occurred. Kinetic alleges a direct injury: it paid cash, out of pocket, to buy a particular device with flaws known to, but concealed by, Medtronic, and then paid again to replace the device when Medtronic finally publicly acknowledged the problem.

Medtronic's argument that, absent a prior adjudication of fault, the case is unripe, is trivial. Of course there has been no such adjudication; there is none, because Medtronic settled individual plaintiffs' claims in the Medtronic MDL. The MDL is not res judicata in this case, but the Court is nonetheless mindful of the factual history set forth in its earlier opinion in In re

14

_Medtronic, Inc., Implantable Defibrillators Litig._, 465 F. Supp. 2d at 888-91. The MDL parties opted against fully litigating the matter, but there is no law holding ripeness can be foreclosed by the self-interested acts of a party-litigant.

It is, similarly, of no concern that Kinetic's employee has not sued Medtronic. Kinetic has withdrawn its negligence and strict liability tort claims. Its remaining claims do not depend on whether Kinetic's employee suffered personal injury; the absence of such allegations is, therefore, irrelevant. To the extent it may become necessary to determine whether Medtronic is liable in tort to Kinetic's employee - for example, concerning Kinetic's subrogation claim - the Court sees no reason why these issues cannot be adjudicated as part of this action.

The matter is ripe for adjudication.

C.  Failure to State a Claim

On a Rule 12 motion, the Court always considers whether plaintiff has stated a claim, favorably considering the non-moving party's well-pleaded factual allegations, then determining whether they plausibly give rise to entitlement to relief. _Ashcroft v. Iqbal_, 129 S. Ct. 1937, 1949-50 (2009). The Court first takes note of the elements of each cause of action. _Id._ at 1947.[7]

---

[7] Although plaintiff's consumer fraud claims are governed by Rule 9, rather than Rule 8, the Court finds _Iqbal_'s analytic sequence instructive for all claims.

1.  <u>Minnesota Consumer Protection Claims</u>

Plaintiff brings claims under Minnesota Statutes §§ 325D.44, 325F.67, and 325F.69 directed to consumer fraud, unfair trade practices, and deceptive advertising. The Court is well aware such claims must be pleaded with particularity, as required by Rule 9(b). <u>See</u> <u>Drobnak</u>, 561 F.3d at 783; <u>Tuttle v. Lorillard Tobacco Co.</u>, 118 F. Supp. 2d 954, 963 (D. Minn. 2000) (Magnuson, J.). Thus, to be maintained, plaintiff's complaint must plead "such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." <u>Abels v. Farmers Commodities Corp.</u>, 259 F.3d 910, 920 (8th Cir. 2001) (internal quotation omitted). Rule 9(b) must be interpreted "in harmony with the principles of notice pleading," allowing defendant to "respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct." <u>Id.</u>

The degree of particularity required depends on the parties' relationship and the nature of the case. <u>BJC Health Sys. v. Columbia Cas. Co.</u>, 478 F.3d 908, 917 (8th Cir. 2007). Where, for example, "plaintiff is not a party to a communication, particularity in pleading may become impracticable" until plaintiff has had the benefit of some discovery. <u>Abels</u>, 259 F.3d at 921.

The Court finds Kinetic's claims are sufficiently detailed to allow Medtronic to respond to its allegations. Plaintiff alleges that, in January, 2003, Medtronic learned of a potentially life-

threatening battery defect in certain of its defibrillators, told no one, crafted a solution, and obtained FDA approval for a change in batteries, which it began installing in its product in December, 2003.  The complaint further alleges that, all the while, Medtronic continued to sell the defective product without warning of the defect.  While the complaint does not identify precisely which Medtronic employee used which words to sell the particular device implanted into Kinetic's employee, or precisely which representations were made to the hospital that purchased the device or the doctor who recommended it, the Court finds the context is sufficiently detailed to allow Medtronic to respond to the allegations.  The Complaint satisfies Rule 9(b).

Medtronic next suggests plaintiff can obtain no relief under the Minnesota statutes targeting consumer fraud and false advertising.  The Court disagrees.

Minnesota Statutes §§ 325D.44, 325F.67, and 325F.69 reflect "clear legislative policy encouraging aggressive prosecution of statutory violations," and therefore, "are generally very broadly construed to enhance consumer protection."  State of Minnesota v. Philip Morris Inc., 551 N.W.2d 490, 496 (Minn. 1996).  "Any person injured" by a violation of these statutes may bring a civil action as provided in the Private Attorney General Statute.  Minn. Stat. § 8.31 subd. 3a.  Because a private plaintiff's authority derives from the Attorney General's enforcement authority, the Minnesota Supreme Court has held it applies only to those who "demonstrate

that their cause of action benefits the public." Ly v. Nystrom, 615 N.W.2d 302, 314 (Minn. 2000); Anderson-Johanningmeier v. Mid-Minnesota Women's Center, Inc., 637 N.W.2d 270, 276-77 (Minn. 2002).

For the purpose of this motion, the Court finds Kinetic may maintain an action under Minnesota Statute § 8.31. The Minnesota Supreme Court reads "any person" broadly. Ly, 615 N.W.2d at 309. For example, it covers the individual purchaser of a restaurant in a one-on-one business transaction, id. at 310, but it is not limited to individual consumers. Church of the Nativity v. WatPro, Inc., 491 N.W.2d 1, 8 (Minn. 1992) (overruled in part on other grounds in Ly v. Nystrom, supra.). Nor is "injury" limited to those who have purchased a defendant's goods; the statute authorizes a private cause of action for "any party injured directly or indirectly" by violations of the consumer protection statutes. See Group Health Plan, Inc. v. Philip Morris Inc., 621 N.W.2d 2, 8-9 (Minn. 2001). Plaintiff "need only plead that the defendant engaged in conduct prohibited by the statutes and that the plaintiff was damaged thereby." Id. at 12. Under the statute, it is not necessary to plead individual consumer reliance on defendant's wrongful conduct; however, plaintiff must prove a "causal nexus" between defendant's wrongful conduct and plaintiff's injuries. Id. at 14. For the reasons set forth in the Court's

discussion of standing, Kinetic meets these criteria.[8]

Similarly, the "public benefit" requirement is not onerous. For example, there is a public benefit in eliminating false or misleading advertising. See <u>Collins v. Minn. School of Business, Inc.</u>, 636 N.W.2d 816, 820-21 (Minn. Ct. App. 2001) <u>aff'd</u>, 655 N.W.2d 320, 329-30 (Minn. 2003). If, but for plaintiff's lawsuit, other "potential consumers might have been injured in the same manner," the public benefit requirement is satisfied. <u>Id.</u> at 821. Where a fraudulent misrepresentation is made only to the plaintiff in connection with a single transaction, enforcement may have no public benefit. See <u>Ly</u>, 615 N.W.2d at 314. Similarly, where a product is recalled from the market before a lawsuit is filed, a plaintiff may not be able to argue that "but for" its lawsuit, a defendant would have continued to make false representations. See <u>Behrens v. United Vaccines, Inc.</u>, 228 F. Supp. 2d 965, 970 (D. Minn. 2002) (Erickson, M. J.).

Here, however, the Court easily discerns a public benefit. This was not a one-off transaction. The complaint alleges 87,000

---

[8] Medtronic argues Kinetic is a sophisticated merchant excluded from coverage under the consumer fraud statutes. The argument is without substance: the Court does not doubt Kinetic is sophisticated in its regular business dealings. But this is the purchase of a complex medical device. Kinetic does not deal in such goods nor hold itself out as having special knowledge or skill in the business of selecting medical devices. See <u>Church of the Nativity</u>, 491 N.W.2d at 7-8. In this context, the Court easily finds Kinetic is not a "merchant," as that term is defined in the Uniform Commercial Code, <u>see</u> Minn. Stat. § 336.2-104(1); it is a consumer for the purposes of Minnesota's consumer fraud remedial statutes.

defibrillators were implanted after Medtronic knew of potentially lethal defects before it decided to inform consumers. (Compl. ¶¶ 1, 19-28.) Medtronic's alleged misrepresentations and omissions were made to the public at large and not disclosed to the FDA, an institution charged with protecting the public. These representations and failures to disclose lulled third-party payors and medical providers into underestimating the true risks of using its products. When setting their insurance rates and premiums, third-party payors attempt to predict upcoming costs. But they cannot predict or easily account for acts of intentional concealment and fraud, as alleged here.

Medtronic's decision to deny third-party payors recompense is an effort to pass off the cost and expense it caused to innocent employers or insurers who must, perforce, either charge the public more to cover the cost of health care, or absorb the cost themselves. As such, plaintiff's effort to place this cost where plaintiff alleges it ought to be borne may well provide a public benefit.

### 2. Multistate Consumer Protection Claims

The complaint pleads in very general terms that Medtronic's conduct violates the consumer protection laws of all fifty states. (Compl. ¶ 76.) Medtronic argues, correctly, that more is needed to state a claim based on alleged violation of these statutes.

But class certification is not before the Court. It is,

therefore, premature to consider choice of law issues or the claims of potential class members in other states.  See Zyprexa, 493 F. Supp. 2d. at 579; K-Dur, 338 F. Supp. 2d at 541.  Kinetic will be granted an opportunity to more precisely identify the members of its putative class in time, and to replead its allegations to comply with Rule 9(b).  Medtronic may then raise its objection to class certification.

### 3.  Breach of Warranty

Kinetic alleges Medtronic breached express and implied warranties to consumers under Minnesota's version of the Uniform Commercial Code.  See Minn. Stat. §§ 336.2-313, 336.2-314, 336.2-315 (2008).  Medtronic argues its warranties do not extend to a third-party payor such as Kinetic, depriving Kinetic of standing to claim a breach.

The Court disagrees.  Minnesota's Uniform Commercial Code provides that a seller's warranty, whether express or implied, "extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty."  Minn. Stat. § 336.2-318 (2008).  The Minnesota Supreme Court holds that "those who purchase, use, or otherwise acquire warranted goods have standing to sue for purely economic losses.  Those who lack any such connection to the warranted goods must demonstrate physical injury or property damage before economic losses are recoverable."  Minnesota Mining & Manufacturing Co. v.

<u>Nishika Ltd.</u>, 565 N.W.2d 16, 21 (Minn. 1997).

Kinetic has a clear connection to the warranted goods; it reimbursed the original purchaser and paid for the installation. Had the goods performed as warranted, Kinetic would not have been subjected so soon to a second surgical procedure. The Court finds a third party payor may be considered one who "purchase[s]" or "otherwise acquire[s] warranted goods" – either directly, in the sense that it has reimbursed the original purchaser, or through right of subrogation. This case does not present the problem anticipated by the Minnesota Supreme Court in <u>Nishika</u>, where "the fortuitous existence of a warranty – between some seller and some buyer, somewhere - would allow remote yet foreseeable parties to recover for their hampered expectations." <u>Id.</u> Rather, Kinetic claims a direct economic loss arising from the reimbursement of expenses concerning a specific, identifiable device, which was the subject of explicit warranties from, and was recalled by, Medtronic. (Compl. ¶¶ 126, 131, 137.)

The Court finds Minnesota Statute § 336.2-318 affords Kinetic standing to bring its warranty claims. Accordingly, the Court need not, and does not, consider the parties' other standing arguments.

### 4. <u>Subrogation</u>

Kinetic's next claim sounds in subrogation. Subrogation allows an insurer to "stand[] in the shoes of the insured and acquire[] all of the rights the insured may have against a third

party." <u>Medica, Inc. v. Atlantic Mutual Ins. Co.</u>, 566 N.W.2d 74,
77 (Minn. 1997). Minnesota recognizes both equitable and
conventional subrogation. <u>Id.</u> Equitable subrogation arises from
the common law; it aims "to place the charge where it ought to
rest, by compelling the payment of the debt by him who ought in
equity to pay it." <u>Id.</u>, <u>citing</u> <u>Westendorf v. Stasson</u>, 330 N.W.2d
699, 703 (Minn. 1983) (internal quotations omitted). Conventional
subrogation arises from an agreement between insurer and insured;
unless the agreement provides otherwise, however, equitable
principles will apply. <u>Medica</u>, 566 N.W.2d at 78.

As to its own employee, Kinetic adequately states a claim for
subrogation. The text of Kinetic's agreement with its employee
clearly establishes a right to conventional subrogation.[9] Kinetic
also claims equitable subrogation. "The right of subrogation
arises once the subrogee makes payment to its insured." <u>Commercial</u>
<u>Union Ins. Co. v. Minnesota School Bd. Ass'n</u>, 600 N.W.2d 475, 480
(Minn. Ct. App. 1999). Here, Kinetic alleges it has already paid
for all medical expenses surrounding its employee's receipt of a

_____

[9] Although the complaint itself does not state the precise
language of the agreement, Kinetic's contractual language is set
forth in its opposition brief. (Pl. Mem. Opp. at 21 n. 8.) It
provides that in the event a participant "incur[s] medical or other
charges related to injuries or illness caused by the act or
omission of another person," or if "Another Party may be liable"
for those charges, and the participant has a "claim against the
other person or Another Party", then "the Plan will be subrogated
to all rights the Participant may have against that other person or
Another Party and will be entitled to reimbursement."

Medtronic defibrillator.  (Compl. ¶¶ 86-88.)

With respect to the class claims, the Court finds Kinetic is entitled to limited discovery to identify individuals from whom other class members might have subrogation claims.  The identities of these individuals are known to Medtronic, and Kinetic has had no opportunity to discover them; Kinetic must be given such an opportunity before it may be required to plead these facts.  <u>Abels</u>, 259 F.3d at 921.

At this stage, plaintiff's class allegations are sufficient to permit limited discovery as to the existence of other subrogation claims.  Following discovery, plaintiff will have the opportunity to amend the complaint.

    5.  <u>Unjust Enrichment</u>

Finally, defendant denies plaintiff can state a claim for unjust enrichment.  The Court disagrees.

A cause of action for unjust enrichment "can be maintained whenever one man has received or obtained the possession of the money of another, which he ought in equity and good conscience to pay over."  <u>Klass v. Twin City Federal Savings & Loan Ass'n</u>, 190 N.W.2d 493, 494-95 (Minn. 1971) (internal quotations omitted).  In <u>Klass</u>, a tenant paid property taxes as required by the lease.  When it turned out no taxes were due, the refund was sent to the landlord, and the tenant brought a claim for unjust enrichment.  The Supreme Court found the tenant was entitled to recover the

24

amount paid, noting the case was governed by the principle that "the party that actually bore the expense eventually received the refund." Id. at 495.

The Court finds Kinetic has sufficiently pleaded it bore the expense of implanting and replacing Medtronic's defective device. It is of no moment that Kinetic paid the hospital which purchased the device, as opposed to paying Medtronic directly. The hospital has been made whole; Kinetic has not; and Medtronic retains the funds paid for the defective product.

The Court recognizes unjust enrichment is an equitable remedy. It is well established that "equitable remedies are available only when no adequate legal remedy exists." Drobnak, 561 F.3d at 787. Where an adequate legal remedy exists, the Court may dismiss a claim for unjust enrichment. Id.

"[U]nder the federal rules, a plaintiff may plead inconsistent facts in support of alternative theories of recovery." Babcock & Wilcox Co. v. Parsons Corp., 430 F.2d 531, 536 (8th Cir. 1970); see also Breeding v. Massey, 378 F.2d 171, 178 (8th Cir. 1967) ("[t]he right of a plaintiff to try his case on alternate theories has uniformly been upheld in the federal courts and plaintiff cannot be required to elect upon which theory to proceed."); Fed. R. Civ. P. 8(d)(3). At a later stage it may be necessary for plaintiff to elect a theory, but at the pleading stage it is not.

The Court finds plaintiff has adequately stated a claim for unjust enrichment.

III. <u>Conclusion</u>

For the foregoing reasons, the Court finds plaintiff has standing. Plaintiff's claims of negligence, negligence per se, strict liability failure to warn, and strict liability design defect, are dismissed with prejudice. Defendant's motion to dismiss plaintiff's remaining claims is denied.

IT IS SO ORDERED.

Dated:  December 4, 2009


<u>s/ JAMES M. ROSENBAUM  </u>
JAMES M. ROSENBAUM
United States District Judge